**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Tristan Tanner,<br><br>Plaintiff,<br><br>v.<br><br>Medtronic, Inc.; Medtronic USA, Inc.,<br><br>Defendants. | Case No. 0:26-cv-2445<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION AND SUMMARY OF ACTION

1.      Plaintiff Tristan Tanner ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following against Defendants Medtronic, Inc. and Medtronic USA, Inc. (collectively, "Defendants").

2.      This class action is brought on behalf of individuals whose sensitive and personally identifiable information ("PII") was stolen by cybercriminals in a cyber-attack that accessed Defendants' data on or around April 17, 2026 (the "Data Breach").

3.      The Data Breach has likely affected millions of individuals across the country, though at this time it is unknown how many individuals' data have been compromised.[1] Issues related to the Data Breach are ongoing.

---

[1] Steve Alder, *Medical Device Maker Medtronic Announces Data Breach*, HIPPAA J. (Apr. 28, 2026), https://www.hipaajournal.com/medical-device-maker-medtronic-data-breach/

4.      Defendants store a tremendous amount of Plaintiff's PII, including his name, birth date, billing and mailing address, financial information, and Social Security number. Defendant also stores vast quantities of protected health information ("PHI"), likely including that of Plaintiff, it collects from its business associates and directly from patients. Presumably, this PII and PHI (collectively, "Private Information" or "PI") has been compromised for Plaintiff and Class members.

5.      As of May 1, 2026, Defendants have yet to notify Plaintiff or provide the public with any specific information regarding its mitigation efforts in the fallout of this Data Breach.

6.      Defendants and associated entities, as  medical industry experts, knew and should have known how to prevent a common cyberattack.

7.      If Plaintiff knew his PII would have been improperly handled, he would have refused to share PII with Defendants.

8.      Accordingly, Plaintiff asserts claims for violations of negligence, negligence *per se*, and unjust enrichment/quasi-contract.

## PARTIES

9.      Plaintiff Tristan Tanner is a citizen and resident of Connecticut. He worked as a full-time Inventory Support IV Specialist at Defendants' location in Mystic, Connecticut, between September 2022 and October 2024. His PII is stored and handled by Defendants.

10.      Defendant Medtronic, Inc. is a Minnesota corporation with its principal place of business in Fridley, Anoka County, Minnesota.

2

11.     Defendant Medtronic USA, Inc., is a wholly owned subsidiary of Medtronic, Inc.. It is a Minnesota Corporation with its principal place of business in Fridley, Anoka County, Minnesota.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction over Plaintiff' claims under 28 U.S.C. § 1332(d)(2) ("CAFA"), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

13.     The Court has personal jurisdiction over Defendants because both defendants are headquartered in the District of Minnesota.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants maintain their principal places of business in this District and therefore reside in this District pursuant to 28 U.S.C. § 1391(c)(2). A substantial part of the events or omissions giving rise to the Class's claims also occurred in this District.

## STATEMENT OF FACTS

**A.     Despite knowing the risks, Defendants failed to maintain reasonable and adequate security measures to safeguard the PII it held.**

15.     Medtronic is the world's largest medical device company by revenue. From pacemakers to surgical robots, Defendants employ more than 95,000 individuals across 150 countries. Defendants serve around 79 million patients annually and had $33.5 billion in revenue in the 2025 fiscal year.

16.    In the course of its business, Defendants collect and store vast quantities of PII for its employees like Plaintiff. They also collect and store PHI from the hospitals and other entities it works with, as well as from patients who use their products and services.[2] Defendants were entrusted with, and obligated to, safeguard and protect PII and PHI of Plaintiff and the Class in accordance with all applicable laws.

17.    Defendant recognizes the value of PI and the importance of protecting it. Medtronic's website provides: "Our customer may sometimes be a hospital, physician, or other healthcare provider; at other times, patients themselves are our customers or clinical trial participants. We obtain the patient information on which our business depends in accordance with applicable laws . . . ."[3]

18.    Defendants publicly claimed: "We maintain appropriate physical, technical and administrative security standards and procedures to safeguard our patient data and systems. Our employees are educated on the importance of our privacy and security policies and must comply with them. Employees are permitted to access and use only the patient information they need to perform their job duties."[4]

---

[2] *See* Medtronic, *U.S. patient privacy principles*, https://www.medtronic.com/en-us/our-company/governance/principles-ethics/us-patient-privacy-principles.html (last accessed Apr. 28, 2026); *Medtronic Website Privacy Statement*, https://www.medtronic.com/ph-en/privacy-statement.html#:~:text=Medtronic%20collects%20Personal%20Data%20that,vendors%2C%20and%20other%20business%20contacts (last accessed Apr. 28, 2026).

[3] Medtronic, *U.S. patient privacy principles*, https://www.medtronic.com/en-us/our-company/governance/principles-ethics/us-patient-privacy-principles.html (last accessed Apr. 28, 2026).

[4] *Id.*

19.     At all relevant times, Defendants knew they were storing sensitive PI and that, as a result, its systems would be an attractive target for cybercriminals.

20.      Defendant also knew that a breach of its systems, and exposure of the information stored therein would result in the increased risk of identity theft and fraud against the individuals whose PI was compromised.

21.     The Data Breach occurred on or around April 17, 2026, and it is an evolving situation.

22.     Defendants have not sent notice to affected individuals. The only information Defendants have provided is the following April 24, 2026, announcement on its website:

> Medtronic has determined that an unauthorized party accessed data in certain Medtronic corporate IT systems.
>
> We have not identified any impact to our products, patient safety, connections to our customers, our manufacturing and distribution operations, our financial reporting systems or our ability to meet patient needs.
>
> The networks that support our corporate IT systems, our products and our manufacturing and distribution operations are separate. Hospital customer networks remain separate from Medtronic IT networks and are secured and managed by customers' IT teams.
>
> **What We're Doing**
>
> Upon identifying this unauthorized access, we immediately took steps to contain the incident, activated our incident response protocols and engaged leading cybersecurity experts to support our investigation and remediation actions.
>
> We are working to identify any personal information that may have been accessed and will provide notifications and support services as needed.  We will continue to provide updates to any impacted individuals as we learn more.

**Our Commitment to our Patients, Customers and Employees**

Protecting patients and the trust placed in Medtronic is our highest priority. The privacy and security of all data with which we are entrusted is a vital part of that. As we resolve any impact of this unauthorized access to data in our systems, we are simultaneously identifying additional ways to further optimize our system security. We currently do not expect a material impact on our business or financial results.[5]

23.    ShinyHunters, a well-known cybergang, took credit for the breach. On its Darkweb site, ShinyHunters claimed that it stole "over 9 million records containing PII."[6] In dark web page claiming credit, ShinyHunters threatened to leak the data it stole unless Defendants engaged in negotiations for a ransom payment by April 21, 2016.[7] The post has since been removed.[8]

24.    In June 2025, Mandiant—a company offering cyber security services— publicly warned that ShinyHunters had begun to target Salesforce CRM customers using tactics such as impersonating IT support staff and requesting that employees accept a connection to Salesforce Data Loader. Once this connection is made, the hackers then exfiltrate the data from Salesforce.[9]

---

[5] *Medtronic statement on unauthorized system access*, MEDTRONIC (Apr. 24, 2026), https://news.medtronic.com/Medtronic-statement-on-unauthorized-system-access

[6] Bill Toulas, *Medtronic confirms breach after hackers claim 9 million records theft*, BLEEPINGCOMPUTER (Apr. 27, 2026), https://www.bleepingcomputer.com/news/security/medtronic-confirms-breach-after-hackers-claim-9-million-records-theft/ (last accessed Apr. 28, 2026)

[7] *Id.*

[8] *Id.*

[9] Lawrence Abrams, *Allianz Life confirms data breach impacts majority of 1.4 million customers*, BLEEPING COMPUTER (July 26, 2025) (https://www.bleepingcomputer.com/news/security/allianz-life-confirms-data-breach-impacts-majority-of-14-million-customers/) (last accessed Feb. 11, 2026).

25.     On June 4, 2025, Google's Threat Intelligence Group ("GTIG") echoed Salesforce's and Mandian's warnings, reporting that the cybercriminal organization UNC6240, (that is, ShinyHunters,) was using a common and well-known social-engineering vishing technique to gain unauthorized access to systems and databases.[10] GTIG explained that ShinyHunters was "a financially motivated threat cluster that specializes in voice phishing (vishing) campaigns specifically designed to compromise organizations' Salesforce instances for large-scale data theft and subsequent extortion."[11] GTIG also explained how to prevent such a breach, highlighted that it is now "essential for [Defendant] to configure and manage access, permissions, and user training according to best practices" to prevent such data security incidents.[12]

26.     ShinyHunters has a history of conducting similar high-profile data breaches using the same type of tactics—including those against PowerSchool and SnowFlake, which impacted companies like Santander, Ticketmaster, AT&T, Advance Auto Parts, Neiman Marcus and Cylance.[13]

---

[10] *See* https://cloud.google.com/blog/topics/threat-intelligence/voice-phishing-data-extortion (last accessed Feb. 11, 2026).

[11] *Id.*

[12] *Id.*

[13] Lawrence Abrams, *Allianz Life confirms data breach impacts majority of 1.4 million customers*, BLEEPING COMPUTER (July 26, 2025), https://www.bleepingcomputer.com/news/security/allianz-life-confirms-data-breach-impacts-majority-of-14-million-customers/ (last accessed Feb. 11, 2026).

**B.     Plaintiff and Class Members Suffered Damages**

27.     Plaintiff's information has presumably been compromised in the Data Breach. The extent of compromised PII is unknown but it likely includes Plaintiff's social security numbers, dates of birth, full or partial names, biometric data, telephone numbers, mailing and billing addresses, email addresses, information contained within state-issued photo identification (including driver's license number, organ donor status, and appearance). The Data Breach also likely compromised individuals' PHI, including patient and record identifiers, information relating to patient treatment (including billing and diagnosis codes, and the dates and locations of treatment), and insurance cards containing name and/or beneficiary number.

28.     Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so that they are aware of, and prepared for, a potential attack.

29.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[14]

30.     The type and breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendants' consumers especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

---

[14] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Apr. 17, 2023).

8

31.    PI is a valuable property right.[15] The value of PI as a commodity is measurable.[16] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[17] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[18] It is so valuable to identity thieves that once PI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

32.    As a result of their real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, PI, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated, and becomes more valuable to thieves and more damaging to victims.

---

[15] *See* Marc Van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFORMATION & COMMUNICATION TECHNOLOGY 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . . ").

[16] Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle./824192.

[17] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[18] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report.

33.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[19]

34.     Even if stolen PI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PI about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

35.     Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and

---

[19] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last visited Apr. 17, 2023).

accessible, some consumers are willing to pay a premium to purchase from privacy protective websites." [20]

36.    Based on the value of PI to cybercriminals and the growing rate of data breaches, Defendant certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

## CLASS ACTION ALLEGATIONS

37.    Plaintiff brings all counts, as set forth below, individually and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, on behalf of a Nationwide Class defined as:

> All persons whose Private Information was compromised as a result of the cybersecurity incident involving Defendants' systems that occurred on or around April 17, 2026. (the "Class").

38.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

39.    *Numerosity*—Federal Rule of Civil Procedure 23(a)(1). The members of the Class are so numerous that joinder of all Class members would be impracticable. On information and belief, the number of Class members is likely in the hundreds of thousands or millions.

---

[20] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) Information Systems Research 254 (June 2011), https://www.guanotronic.com/~serge/papers/weis07.pdf.

40.    ***Commonality and Predominance***—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3). Common questions of law and fact exist as to all members of the Class and predominant over questions affecting only individual members of the Class. Such common questions of law or fact include, *inter alia*:

a.  Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

b.  Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

c.  Whether Defendants' properly implemented their purported security measures or their associate's purported security measures to protect Plaintiff and the Class's PI from unauthorized capture, dissemination, and misuse;

d.  Whether Defendants' took reasonable measures to determine the extent of the Data Breach after they first learned of it;

e.  Whether Defendants disclosed Plaintiff and the Class's PI in violation of the understanding that the PI was being disclosed in confidence and should be maintained;

f.  Whether Defendants' conduct constitutes breach of an implied contract;

g.  Whether Defendants willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiff and the Class's PI;

h.  Whether Defendants were negligent in failing to properly secure and protect Plaintiff and the Class's PI;

i.  Whether Defendants were unjustly enriched by their actions; and

j.  Whether Plaintiff and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

41.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and other members of the Class. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action

42.    ***Typicality***—Federal Rule of Civil Procedure 23(a)(3). Plaintiff' claims are typical of the claims of the other members of the Class, because among other things, all Class members were similarly injured through Defendants' uniform misconduct described above and were thus all subject to the Data Breach alleged herein. Further, there are no defenses available to Defendants that are unique to Plaintiff.

43.    ***Adequacy of Representation***—Federal Rule of Civil Procedure 23(a)(4). Plaintiff is an adequate representative of the Nationwide Class because his interests do not conflict with the interests of the Classes they seek to represent, they have retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and their counsel.

44.     *Injunctive Relief*—Federal Rule of Civil Procedure 23(b)(2). Defendants have acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class.

45.     *Superiority*—Federal Rule of Civil Procedure 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**Negligence**

46.     Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

47.    Defendants owed numerous duties to Plaintiff and the Class, including the following:

a. A duty to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PI in their possession;

b. A duty to protect PI using reasonable and adequate security procedures, systems, and resolutions that are compliant with industry-standard practices;

c. A duty not to subject Plaintiff and the Class's PI to an unreasonable risk of exposure and theft because Plaintiff and Class were foreseeable and probable victims of any inadequate security practices.

d. A duty to use reasonable security measures that arose as a result of the special relationship that existed between Defendants and patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law.

48.    Upon Defendants accepting and storing the PI of Plaintiff and the Class in their computer systems and on their networks, Defendants undertook and owed a heightened duty to Plaintiff and the Class to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. Defendants knew that the PI was private and confidential and should be protected as such.

49.    Defendants' duty to use reasonable security measures under HIPAA for patient-related PI required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health

information." 45 C.F.R. § 164.530(c)(1). At least a portion of the PI exfiltrated in this case likely constitutes "protected health information" within the meaning of HIPAA.

50.    In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted, and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

51.    Defendants' violation of the FTC Act and state data security statutes constitutes negligence *per se* for purposes of establishing the duty and breach elements of Plaintiff' negligence claim. Those statutes were designed to protect a group to which Plaintiff belongs and to prevent the type of harm that resulted from the Data Breach.

52.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of statutes and regulations, but also because cybersecurity and healthcare industry standards bound Defendants to protect confidential PI.

53.    Defendants' own conduct also created a foreseeable risk of harm to Plaintiff and Class members and their PI. Defendants' misconduct included failing to: (1) secure Plaintiff and Class members' PI; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; (4) respond to security alerts in a timely manner and (5) implement the systems, policies, and procedures necessary to prevent this type of data breach. Defendants were in a special position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class members from a data breach.

54.     Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff and Class members' PI. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff and Class members' PI;

b. Failing to adequately monitor the security of Medtronic's networks and systems;

c. Allowing unauthorized access to Plaintiff and Class members' PI;

d. Failing to resolve in a timely manner that Plaintiff and Class members' PI had been compromised; and

e. Failing to offer protection to Plaintiff and Class members to mitigate the potential for identity theft and other damages.

But for Defendants' breach of their duties, the  PI would not have been stolen.

55.     Through Defendants' acts and omissions described in this Complaint, including their failure to provide adequate security and their failure to protect Plaintiff' and Class members' PI from being foreseeably captured, accessed, disseminated, stolen and misused, Defendants unlawfully breached their duty to use reasonable care to adequately protect and secure Plaintiff' and Class members' PI during the time it was within Defendants' possession or control.

56.     Defendants' conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to, failing to adequately protect the PI of Plaintiff and Class members.

57.    Plaintiff and Class members had no ability to protect their PI once it was in Defendants' possession and control. Defendants were in an exclusive position to protect against the harm suffered by Plaintiff and Class members as a result of the Data Breach.

58.    Neither Plaintiff nor the other Class members contributed to the Data Breach and subsequent misuse of their PI as described in this Complaint.

59.    There is a temporal and close causal connection between Defendants' failure to implement adequate data security measures, the Data Breach, and the harms suffered by Plaintiff and Class members.

60.    Plaintiff and Class members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide free credit monitoring and compensation for harm to all Class members.

### COUNT II
### Negligence *per se*

61.    Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

62.    Defendant owed a duty to Plaintiff and Class members to keep their Sensitive Private Information secure, arising under FTC Act.

63.    Specifically, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendants for failing to use reasonable measures to protect

Sensitive Private Information. Various FTC publications and orders further form the basis of Defendants' duty.

64.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Sensitive Private Information and not complying with the industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of Sensitive Private Information it obtained and stored and the foreseeable consequences of a data breach involving the highly Sensitive Private Information that Defendant collected, stored, and maintained, including the damages that would result to Plaintiff and Class members.

65.    Plaintiff and Class members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

66.    Defendant is a HIPAA covered entity.

67.    Plaintiff and the Class, as patients, are within the class of people HIPAA was designed to protect and HIPAA was intended to protect Plaintiff and the Class against the type of harm that occurred, namely, unauthorized access to Plaintiff's and the Class's medical information.

68.    Defendants' implementation of inadequate data security failed to comply with HIPPA.

69.    Defendants' violations of Section 5 of the FTC Act as well as HIPAA constitute negligence *per se*.

70.    Defendant violated its duties by, among other things, inadequate security systems, protocols and practices that were insufficient to protect the Sensitive Private

Information of Plaintiff and Class members, and by failing to timely and adequately notify Plaintiff and Class members of the Data Breach.

71.    Defendants' violations constitute negligence per se because Defendant violated laws designed to protect a specific class of persons—Plaintiff and Class members—from a particular type of harm that Defendants' conduct caused.

72.    Plaintiff and Class members suffered injuries of the type the statutes were intended to prevent, including: (a) actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (b) the loss of the value of their privacy and the confidentiality of the stolen Sensitive Private Information and loss of control over their Sensitive Private Information; (c) the illegal sale of the compromised Sensitive Private Information on the black market; (d) the present and continuing threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (e) mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; (f) the time spent in response to the Data Breach reviewing bank statements, credit card statements, financial account statements, credit reports, health insurance statements, and other related activities; (g) the expenses incurred and time spent initiating fraud alerts; (h) the resulting decrease in credit scores and ratings; (i) emotional distress; (j) their lost work time; (k) the lost value of the Sensitive Private Information; (l) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; and (m) nominal and general damages and other economic and non-economic harm suffered.

20

73. Defendants' violations of these statutes were a direct and proximate cause of Plaintiff's and Class members' injuries and damages.

74. As a result of Defendants' negligence *per se*, Plaintiff and Class members are entitled to all relief available under law, including compensatory and consequential damages, statutory damages where available, injunctive relief, and such other relief as the Court deems just and proper.

## COUNT III
### Unjust Enrichment/Quasi-Contract

75. Plaintiff and Class members re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

76. This claim is pled in the alternative to Plaintiff's breach of implied contract claim.

77. Plaintiff and Class members conferred benefits upon Defendants.

78. In exchange for providing payment and PI, Plaintiff and Class members should have received adequate safeguarding of their PI.

79. Defendants knew that Plaintiff and Class members conferred a benefit on it and accepted, has accepted, or retained that benefit. Defendants profited from Plaintiff' payments and used Plaintiff and Class members' PI for business or business associate purposes. Defendants have not compensated the victims of the Data Breach.

80. Defendants failed to secure Plaintiff' and Class members' PI and, therefore, did not provide full compensation for the benefit the Plaintiff' and Class members' PI provided.

81. Defendants acquired the PI through inequitable means as they failed to disclose the inadequate security practices previously alleged.

82. If Plaintiff and Class members knew that Defendants would not secure their PI using adequate security, they would not have made transactions with Defendants or Defendants' associates.

83. Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class members conferred on them.

84. Under principles of equity and good conscience, Defendants should not be permitted to retain the full monetary benefit of its transactions with Plaintiff and Class members. Defendants failed to adequately secure the PI it held and, therefore, did not provide the full services that Plaintiff and Class members directly or indirectly paid for. Patients now must monitor their personal, immutable PI for the rest of their lives.

85. If Plaintiff and Class members knew that Defendants employed inadequate data security safeguards, they would not have agreed to provide Defendants with PI.

86. As a direct and proximate result of Defendants' conduct, Plaintiff and Class members have suffered the various types of damages alleged herein.

87. Plaintiff and Class members have no adequate remedy at law. Defendants continue to retain Plaintiff and Class members' PI, and similar data security practices and vendors while exposing the PI to a risk of future data breaches of PI in Defendants' possession.

88. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that they

unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class members overpaid.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests the following relief:

A.      An Order certifying this case as a class action;

B.      An Order appointing Plaintiff as class representative;

C.      An Order appointing the undersigned counsel as class counsel;

D.      An award of compensatory damages to Plaintiff, money for significant and reasonable identity protection services, statutory damages, treble damages, and damages;

E.      Injunctive relief requiring Defendants to, *e.g.*: (i) strengthen and adequately fund their data security systems and monitoring procedures; (ii) submit to future independent annual audits of those systems and monitoring procedures; (iii) implement encryption of sensitive PI in all databases for all clients; and (iii) immediately provide free credit monitoring to all Class members;

F.      An Order for Defendants to pay equitable relief, in the form of disgorgement and restitution, and injunctive relief as may be appropriate;

G.      An Order for Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

H.      An award of Plaintiff's attorneys' fees and litigation costs; and

I.      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 1, 2026                          Respectfully submitted,

By:  /s/David A. Goodwin
    Daniel E. Gustafson (#202241)
    David A. Goodwin (#386715)
    Joe E. Nelson (#402378)
    **GUSTAFSON GLUEK PLLC**
    Canadian Pacific Plaza
    120 South Sixth Street, Suite 2600
    Minneapolis, MN 55402
    Tel: (612) 333-8844
    dgustafson@gustafsongluek.com
    dgoodwin@gustafsongluek.com
    jnelson@gustafsongluek.com

    **WOODS LONERGAN PLLC**
    James F. Woods (*pro hac vice forthcoming*)
    Annie E. Causey (*pro hac vice forthcoming*)
    60 East 42nd Street, Suite 1410
    New York, New York 10165
    Tel: 212.684.2500
    jwoods@woodslaw.com
    acausey@woodslaw.com

    ***Attorneys for Plaintiff***

24